UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

DER TRAVEL SERVICES, INC.,                :

                        Plaintiff,        :    99 Civ. 2231 (HBP)

     -against-                            :    OPINION
                                               AND ORDER
DREAM TOURS & ADVENTURES, INC.,           :
CARL ORSINI, ALBERT GHIM, and
TONY KIM,                                 :

                        Defendants.       :

----------------------------------X


          PITMAN, United States Magistrate Judge:


I.  Introduction


          This is an action for breach of contract, fraud and

conversion arising out of the alleged misappropriation of

$108,300 of blank, non-revocable European railway passenger

tickets.  Plaintiff, DER Travel Services, Inc. ("DER Travel"), is

the supplier of the tickets.  The only remaining defendant,[1] Carl

Orsini, negotiated and executed the contract on behalf of Dream

Tours & Adventures, Inc. ("Dream Tours") pursuant to which Dream

_____

          [1]Defendants Albert Ghim ("Ghim") and Dream Tours &
Adventures, Inc ("Dream Tours") have defaulted and default
judgments were entered against them, jointly and severally, on
November 26, 2001 and January 17, 2002 (Docket Item Nos. 42, 43,
49).

          Defendant Tony Kim has not been located and has not,
therefore, been served with process (Affidavit of Stanley K.
Shapiro in Opposition to Defendant's Motion for Summary Judgment,
dated March 2, 2001, ("Shapiro Aff."), at 2, fn. 1).

Tours was to sell the tickets on consignment for a commission. Plaintiff claims that the tickets were transferred, without notice and in breach of contract, to a third-party, Tony Kim ("Kim"), who sold a portion of the tickets and kept all proceeds. As a result, plaintiff terminated the contract and demanded payment for the unauthorized sales, as well as the return of the unsold tickets. Defendants neither paid for the tickets sold nor returned the unsold tickets. Plaintiff brought this action seeking to recover the value of the tickets, plus exemplary damages of $1,000,000, interest, costs and disbursements.

The parties consented to my exercising plenary jurisdiction over this matter pursuant to 28 U.S.C. § 636(c), and the matter was tried before me, without a jury, on May 20, 2002. The parties completed making post-trial submissions in July 2002. Based on the testimony and other evidence offered at trial and in the parties' post-trial submissions, I make the following findings of fact and conclusions of law.

II.  Findings of Fact

    A.  The Parties

    1.  DER Travel is a California corporation with its principle place of business in Rosemont, Illinois (Stipulated Facts[2] ¶ 1).

    2.  DER Travel is in the business of selling European railway tickets in the United States both directly and through independent sales agents (Stipulated Facts ¶ 2).

    3.  Orsini is a citizen of the State of New York. (Stipulated Facts ¶ 3; see also Orsini Dep. (PX 23-A) at 4-5).

    4.  Orsini received a Bachelor of Science degree in Business Administration from Fordham University in 1971, upon graduation, worked for both accounting and investment banking firms and, currently, is involved in the "import and export" business (Tr. 41-43, 59-62; see also Orsini Dep. (PX 23-A) at 5-17, 26-28, 31-34).

---

[2]"Stipulated Facts" refers to the parties Joint Statement of Agreed and Stipulated Facts, set forth in Section VI of the Joint Pretrial Order, and marked as Plaintiff's Exhibit 21-A.  "Tr." refers to the transcript of the trial in this matter.  "Dep.," preceded by a name, refers to the transcript of the deposition of the witness identified in the citation.  The parties have marked the deposition transcripts as exhibits and the parenthetical reference after "Dep." refers to the exhibit number of the deposition transcript.  Finally, "PX" and "DX" refers to plaintiff's exhibits and defendant's exhibits, respectively.

5.   Orsini testified that he was the "incorporator," "general manager" and "chairman" of Petrotech Holding Corp. ("Petrotech") and was entitled to receive a one-third interest of its profits.  Petrotech is an import and export trading company organized under the laws of New York (Tr. 43, 62-67, 125-26; <u>see also</u> Orsini Dep. (PX 23-A) at 6-7, 14-17, 19, 23).

6.   When incorporated, Petrotech listed its principle place of business as 1983 Marcus Avenue, Lake Success, New York (Tr. 68; <u>see also</u> Orsini Dep. (PX 23-A) at 16-17).  Petrotech's office consisted of only one desk with a typewriter in a single cubicle subleased from and located in the office of an unrelated company.  Petrotech shared its telephone and facsimile with its lessor, was not listed on the building's directory nor was any sign posted on the door bearing Petrotech's name (Tr. 68-69; <u>see also</u> Orsini Dep. (PX 23-A) at 17-20, 24-25).

7.   In or about January or February 1998, Petrotech closed its Lake Success office and moved to 130 William Street, New York, New York (Stipulated Facts ¶ 20; Tr. 97, 103; DX B at 5; <u>see also</u> Orsini Dep. (PX 23-A) at 20-25).  Some time in early 1999, Petrotech moved its office yet again, this time to Emmons Avenue in Brooklyn (Orsini Dep. (PX 23-A) at 25).  Presently, Petrotech has no office or principle place of business and is "more or less dormant" according to Orsini (Orsini Dep. (PX 23-A) at 6).

8.  On or about November 10, 1997, Dream Tours was organized under the laws of New York; its incorporation papers list 12 East 32nd Street, New York, New York as the address for service of process (Stipulated Facts ¶ 9; PX 14).  At all relevant times, Dream Tours conducted all of its business with DER Travel from Petrotech's offices at 1983 Marcus Avenue, Lake Success and 130 William Street (Stipulated Facts ¶ 20; Tr. 77-79, 91, 97-100; <u>see</u> <u>also</u> Orsini Dep (PX 23-A) at 130-31).

9.  Orsini testified that Ghim thought up the name Dream Tours and Adventures, believing the name would appeal to members of the Asian community and potential customers (Tr. 76; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 77).

10.  There was uncontradicted evidence submitted that Kim arranged for the filing of Dream Tours' Certificate of Incorporation by employing the services of Tae Ok Park ("Park"), a Certified Public Account with an office in Manhattan (Park Dep. (PX 24) at 11-20).

11.  Dream Tours' Certificate of Incorporation and Kim's business card list the same business address -- 12 East 32nd Street, New York, New York (DX A3; Tr. 51, 54-55; Park Dep. (PX 24) at 15).

12.  Orsini testified that he was not directly involved in the incorporation of Dream Tours; rather, Orsini believed Ghim

was responsible for Dream Tours' incorporation (Tr. 45-47, 56-57; DX B at 3, 7; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 66-67, 144-45).

13.  Orsini and Park testified that they had no knowledge of Dream Tours holding organizational meetings, adopting bylaws, electing a board of directors, issuing shares of stock, filing corporate tax returns with the Internal Revenue Service, maintaining corporate meeting minutes, or engaging in similar corporate activities (Tr. 46-47, 56; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 143-47; Park Dep. (PX 24) at 21-22, 25-27).

14.  Orsini, however, in signing correspondence to DER Travel, setting up a corporate bank account, and executing agreements such as the railway ticket contract at issue, represented that he was the "Chairman" of both Petrotech and Dream Tours (PX 3, PX 6; DX A5, DX A9; Tr. 47, 66, 71, 78, 87-88, 104, 131-33; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 89, 93).

15.  Although Orsini held himself out as the Chairman of Dream Tours in his dealings with DER Travel, he testified that he did not consider himself to be the Chairman.  Rather, he considered himself to be a salesman (Tr. 79, 104, 131-33).

16.  Orsini testified that the only individuals involved in Dream Tours were himself, as Chairman and salesman, Ghim, as Secretary-Treasurer and owner, and Kim, as Dream Tour's travel expert (Tr. 44-47, 50-51, 78, 81-83, 111, 129, 131-33; <u>see</u>

<u>also</u> Orsini Dep. (PX 23-A) at 80-81, 93-94, 106-10, 119, 143-144).

17. Orsini testified that he did not own shares of Dream Tours' stock and received no direct compensation from Dream Tours for his efforts in negotiating and executing a contract with DER Travel on behalf of Dream Tours (Tr. 46, 95-96; DX B at 4; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 75-76). Orsini did testify that the he was entitled to receive 20% of the profits from any travel business he sold on behalf of Dream Tours; he did not enter into any subsequent business arrangements on Dream Tours' behalf (Tr. 95-97; DX B at 4; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 68-74).

B. Orsini's Interactions with Ghim
   and Kim Prior to Contracting with DER Travel

18. Orsini first met Ghim at the end of 1996 through his companion, Marina Davis, who worked with a business acquaintance of Ghim's (Tr. 130, 134; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 26-28).

19. On May 16, 1997, Orsini entered into a joint business arrangement with Ghim -- memorialized in a signed writing -- under which they agreed to join their import and export businesses together and share equally in the profits of their sales (Tr. 67-74, 124-25; PX 18; DX B at 2-3; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 28-32).

7

20.  In or about October 1997, Ghim approached Orsini about setting up a business that would sell European rail travel (Tr. 42; 75-76; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 61-63).

21.  Ghim provided Orsini with DER Travel's address and telephone number and requested that Orsini negotiate a contract with DER Travel (Tr. 76-78; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 61-63, 77).

C.  Orsini's Transactions with
    <u>DER Travel and the Formation of a Contract</u>

22.  On or about October 27, 1997, Orsini called DER Travel in Illinois to get information about selling European rail tickets as an agent of DER Travel (Stipulated Facts ¶¶ 4, 10; Tr. 42-45, 74-79; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 71, 76-77).

23.  Orsini told his contact at DER Travel that he wanted to establish a broker's relationship with DER Travel and sought to get railway tickets from DER Travel to sell in the New York market (Stipulated Facts ¶ 7; Tr. 43-45, 78-79; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 82).

24.  Based on Orsini's telephone call, DER Travel prepared a Request Form for a New Outlet Agreement identifying Orsini as the "Contact Person," Petrotech as the "Agency Name" and listing Petrotech's Lake Success office address, telephone and facsimile numbers as those to be used for subsequent corre-

spondence (Stipulated Facts ¶ 5; PX 1; Tr. 79; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 82).

25. From November through December 1997, through correspondence and telephone conversations between Orsini and DER Travel, the parties conducted negotiations concerning Dream Tours becoming DER Travel's sales agent (Stipulated Facts ¶ 6; PX 2-5; DX A5-A8, DX B at 6; Tr. 82-83; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 82-93).

26. DER Travel originally proposed providing inventory to Dream Tours in blocks of 30 to 50 tickets; Orsini persuaded DER Travel to increase the size of the installment to 150 tickets. Orsini also negotiated a reduction in the cash deposit Dream Tours would provide to DER Travel from the requested $25,000 to $15,000 (Stipulated Facts ¶ 8; PX 2-5; DX A5-A8; Tr. 83-87; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 82-84, 87-92).

27. DER Travel and Dream Tours entered into a contract on or about December 19, 1997 (Stipulated Facts ¶ 11; PX 6; DX A9; Tr. 47, 87).

28. The contract was executed by Orsini as Chairman of Dream Tours (Stipulated Facts ¶ 11; PX 6; DX A9).

29. The contract identified 1983 Marcus Avenue, Suite 123, Lake Success, NY -- Orsini's Petrotech office -- as the "appointed" sales office for maintaining the tickets consigned under the contract (Stipulated Facts ¶ 12; PX 6; DX A9).

30. None of the correspondence between DER Travel and Orsini contained any mention of either Ghim's or Kim's involvement in Dream Tours (Tr. 83, 94-95).

31. Orsini did testify, however, that he mentioned Ghim's name in telephone discussions with DER Travel (Tr. 44-45). Orsini admitted that he did not mention Kim's name in his discussions with DER Travel prior to June 1998 (Tr. 51-52).

D. Dream Tours
   Opens a Bank Account

32. On December 22, 1997, three days after the contract with DER Travel was fully executed, Dream Tours' opened a bank account with Fleet Bank with an initial deposit totaling $15,100; the initial deposit was made up of two separate deposits. The account documents listed Orsini and Shik Hungi Ghim (also known as Hung Shik Ghim and Albert Ghim, see Orsini Dep. (PX 23-A) at 30-31) as authorized signatories, as well as identifying Orsini as Chairman and Ghim as Secretary-Treasurer (Stipulated Facts ¶ 13; PX 15, 17; DX A12, A13, A15, DX B at 4; Tr. 88-90; see also Orsini Dep. (PX 23-A) at 122-28).

33. Also on December 22, 1997, Orsini wire transferred $15,000 from Dream Tours' bank account to DER Travel (Stipulated Facts ¶ 14; PX 16; DX A14; Tr. 90-91; see also Orsini Dep. (PX 23-A) at 125-27).

34.  Dream Tours' Fleet Bank account was its only bank account and was used solely for paying DER Travel the $15,000 deposit for consignment of the tickets; the account had no further activity except debits for recurring bank fees, which, ultimately, exhausted the remaining balance in the account (Stipulated Facts ¶ 15; PX 17; DX A15; Tr. 56-57, 91; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 122-29).

E.  Delivery of the Tickets
    and their Misappropriation

35.  On December 23, 1997, DER Travel delivered one hundred Eurail Pass tickets and fifty EuroPass tickets addressed to "Atten: Carl Orsini, Dream Tours and Adventures" to Orsini's Petrotech office at 1983 Marcus Avenue (Stipulated Facts ¶ 16; PX 8; Tr. 47, 91).  At DER Travel's request, a receipt evidencing delivery and acceptance of the tickets was signed by Orsini for Dream Tours on December 23, 1997 (Stipulated Facts ¶ 16; PX 8; Tr. 91-93).

36.  Also, on January 22, 1998, after the contract was executed and the tickets delivered, Orsini signed his initials next to specific provisions in the contract, including Articles 3, 4, 5.1, 5.2 and 5.3, and faxed this initialed document back to DER Travel (Stipulated Facts ¶ 19; PX 7; Tr. 93-94; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 116-19).

11

(a). Article 3 of the contract required a "monthly report" on credit card sales and an "inventory listing" (PX 7; Tr. 94).

(b). Article 4.4 of the contract required Dream Tours to "inform DER Travel Service, without delay, of any change in the organization, address or status of the appointed office" (Stipulated Facts ¶ 23; PX 7; Tr. 94).

(c). Article 4.8 of the contract required Dream Tours to "keep ticket stock and all accountable documents pertaining to the issuance of Railpasses in an office safe at all times" (Stipulated Facts ¶ 23; PX 7; Tr. 94).

(d). Article 5.1 of the contract stated that "[Dreams Tours] will be responsible to [DER Travel] for the total value of each ticket furnished and no longer in its possession whatever the reason" (Stipulated Facts ¶ 17; PX 7; Tr. 94).

(e). Article 5.2 of the contract obligated Dream Tours to provide DER Travel with "accounting and statistical data on the sales of Europasses . . . on the last day of each month" (Stipulated Facts ¶ 18; PX 7; Tr. 94).

(f). Article 5.3 of the contract required
Dream Tours to provide DER Travel with payment, in
the form of a check, for the total value of the
tickets sold by Dream Tours, less commissions, and
"a month end inventory list of the remaining tick-
ets or paper stock" (Stipulated Facts ¶ 18; PX 7;
Tr. 94).

37. In or about January or February 1998, shortly
after Orsini had received the tickets and returned the initialed
subsections of the contract to DER Travel, Orsini moved out of
his Petrotech office at 1983 Marcus Avenue and into an office at
130 Williams Street (Stipulated Facts ¶ 20; Tr. 97-99; DX B at 5;
see also Orsini Dep. (PX 23-A) at 55, 58-61).

38. Prior to June 1998, Orsini did not inform DER
Travel that he had changed office locations or that he no longer
maintained the tickets in a safe he shared at his Petrotech
office in Lake Success (Stipulated Facts ¶ 22; PX 9; Tr. 99-103;
see also Orsini Dep. (PX 23-A) at 111-15).

39. Prior to June 1998, Orsini did not apprise DER
Travel of the fact that he had transferred possession of the
tickets to Ghim (Stipulated Facts ¶¶ 21, 22; Tr. 107-09; DX B at
5; see also Orsini Dep. (PX 23-A) at 116).

40.  At some date prior to June 22, 1998, Orsini and/or Ghim delivered the tickets into the custody of Kim (Stipulated Facts ¶ 25).

41.  Neither Orsini nor any persons associated with Dream Tours ever provided DER Travel with the monthly accountings and inventories of the tickets, both sold or unsold, that were called for in the contract (Stipulated Facts ¶ 24).

42.  In mid-June 1998, DER Travel was advised by another customer that the tickets were being offered for sale by purported "subagents of Carl Rossini" at below wholesale prices (Stipulated Facts ¶ 26; PX 11; DX B at 6).

43.  By letter dated June 22, 1998, DER Travel gave Orsini and Dream Travel one month's notice of termination of the contract in accordance with Article 6.2 of the contract (Stipulated Facts ¶ 27; PX 9).

44.  Pursuant to Article 6.4 of the contract, Dream Tours was obliged to return to DER Travel all unsold rail tickets upon termination (Stipulated Facts ¶ 28; PX 6).

45.  On July 22, 1998, the contract was terminated (Stipulated Facts ¶ 29; PX 12).

46.  To date, none of the tickets delivered to Orsini and Dream Tours were accounted for, paid for, or returned to DER Travel (Stipulated Facts ¶ 30).

47. The value of the tickets consigned by DER Travel to Orsini and Dream Tours was $108,300, calculated as follows: one hundred (100) Eurail Pass tickets with a face value of $857, and fifty (50) EuroPass tickets with a face value of $452 each (Stipulated Facts ¶ 31).

48. DER Travel retained the $15,000 deposit provided by Dream Tours as an offset against damages (Stipulated Facts ¶ 32; PX 6).

III. Conclusions of Law and Findings
of Fact that are Dependent Upon
The Applicable Principles of Law

A. Jurisdiction

49. The Court has subject-matter jurisdiction over this action on the basis of diversity of citizenship. 28 U.S.C § 1332(a)(1).

50. Defendant has not challenged the propriety of venue in this district, and thus any such objection is waived. See 28 U.S.C § 1406(b); Fed.R.Civ.P. 12(h)(1). Defendant's answer asserts the affirmative defense of insufficient service of process (Answer ¶ 23). However, defendant has failed to move to dismiss on the basis of insufficient service of process or to offer any evidence establishing the purported invalidity of service upon Orsini; thus, this defense is also waived. See Datskow v. Teledyne, Inc., Continental Products Div., 899 F.2d

1298, 1303 (2d Cir. 1990) ("A delay in challenging personal jurisdiction by motion to dismiss has resulted in waiver, even where, as here, the defense was asserted in a timely answer."), citing Burton v. Northern Dutchess Hospital, 106 F.R.D. 477, 481 (S.D.N.Y. 1985).

### B. Choice of Law

51.  The contract at issue in this matter does not contain a choice of law provision nor do the parties address the issue of choice of law in any of their submissions; however, the parties exclusively cite to New York case law and to federal courts within the Second Circuit applying New York law as authority for the legal issues presented.

52.  Since New York has a substantial connection to the dispute, and in light of the parties exclusive citation to New York authority, I shall apply New York law.  By citing only to New York authority, the parties impliedly manifested their acquiescence to New York law controlling this dispute, and such "implied consent . . . is sufficient to establish choice of law." Loo v. Prudential Ins. Co., 03 Civ. 8409 (DLC), 2004 WL 3017013 at *6 n.13 (S.D.N.Y. Dec. 30, 2004), citing Santalucia v. Sebright Transp., Inc., 232 F.3d 293, 296 (2d Cir. 2000), quoting Tehran-Berkeley Civil & Environmental Engineers v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir.

1989); <u>see</u> <u>also</u> <u>W.M. Passalaqua Builders, Inc. v. Resnick Devel-</u><u>opers S., Inc.</u>, 933 F.2d 131, 137 (2d Cir. 1991) (applying the law of the forum state, New York, because both parties had relied exclusively on that law to support their arguments); <u>Granat v.</u> <u>Center Art Galleries-Hawaii, Inc.</u>, 91 Civ. 7252 (RLC), 1993 WL 403977 at *2 (S.D.N.Y. Oct. 6, 1993) ("[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied."), <u>quoting</u> <u>Walter E. Heller & Co. v. Video Innovations, Inc.</u>, 730 F.2d 50, 52 (2d Cir. 1984).

      C.    Plaintiff's Breach of Contract
                 <u>Claim Against Defendant Orsini</u>

     53.  In order to sustain a breach of contract claim, plaintiff must prove the following elements by a preponderance of the evidence: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." <u>Harsco Corp. v.</u> <u>Segui</u>, 91 F.3d 337, 348 (2d Cir. 1996), <u>citing</u> <u>Tagare v. NYNEX</u> <u>Network Sys. Co.</u>, 921 F. Supp. 1146, 1149 (S.D.N.Y. 1996).

     54.  Plaintiff and Orsini do not dispute that Dream Tours breached its contract with DER Travel.  Rather, the only issue is whether defendant Orsini can be held personally liable for Dream Tours' breach of contract under the doctrine of piercing the corporate veil.

1.  Legal Principles Applicable to
    Plaintiff's Claim against Orsini
    for Breach of Contract Pursuant to the
    Doctrine of Piercing the Corporate Veil

55.  The doctrine of piercing the corporate veil permits the owners of a corporation, under certain limited circumstances, to be held liable for the corporation's obligations, such as the contract at issue.  See, e.g., Morris v. N.Y.S. Dep't of Taxation & Fin., 82 N.Y.2d 135, 140-41, 623 N.E.2d 1157, 1160, 603 N.Y.S.2d 807, 810 (1993).  Accord Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., supra, 933 F.2d at 138 ("The doctrine . . . is invoked 'to prevent fraud or to achieve equity.'") quoting, Intn'l Aircraft Trading Co. v. Mfrs. Trust Co., 297 N.Y. 285, 292, 79 N.E.2d 249, 252 (1948); see also JSC Foreign Econ. Ass'n Technostroyexport v. Intn'l Dev. & Trade Servs., Inc., 306 F. Supp.2d 482, 485 (S.D.N.Y. 2004) ("New York courts will pierce the corporate veil 'whenever necessary to prevent fraud or achieve equity.'"), quoting Walkovszky v. Carlton, 18 N.Y.2d 414, 417, 223 N.E.2d 6, 7, 276 N.Y.S.2d 585, 587 (1966).

56.  In order to pierce the corporate veil the plaintiff must prove the following: "(1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or other wrong; and (3) the fraud or wrong

results in an unjust loss or injury to the plaintiff." In re Vebeliunas, 332 F.3d 85, 91-92 (2d Cir. 2003); see also, e.g., Freeman v. Complex Computing Co., Inc., 119 F.3d 1044, 1052 (2d Cir. 1997); Thrift Drug, Inc. v. Universal Prescription Adm'rs, 131 F.3d 95, 97 (2d Cir. 1997); Am. Fuel Corp. v. Utah Energy Dev. Co., Inc., supra, 122 F.3d at 134 (2d Cir. 1997); Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc., 2 F.3d 24, 26 (2d Cir. 1993); Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., supra, 933 F.2d at 139; Am. Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988); Walter E. Heller & Co. v. Video Innovations, Inc., supra, 730 F.2d at 53; Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir. 1979); TNS Holdings, Inc. v. MKI Secs. Corp., 92 N.Y.2d 335, 339, 703 N.E.2d 749, 751, 680 N.Y.S.2d 891, 893 (1998); Lowendahl v. Balt. & Ohio R.R. Co., 247 A.D. 144, 157, 287 N.Y.S. 62, 75-76 (1st Dep't), aff'd, 272 N.Y. 360, 6 N.E.2d 56 (1936).

57.   Whether the corporate veil should be pierced requires a fact specific inquiry; there are no bright-line rules. See MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 64 (2d Cir. 2001); Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., supra, 933 F.2d at 139 ("[T]he infinite variety of situations that might warrant disregarding the corporate form is not an easy task because disregarding corporate separateness is a remedy that 'differs with the circum-

stances of each case.'"), _quoting_ _Am. Protein Corp. v. AB Volvo_,

_supra_, 844 F.2d at 60.

58.  New York courts consider the following factors in

deciding whether the corporate veil should be pierced:

> (1) the absence of the formalities and paraphernalia
> that are part and parcel of the corporate existence,
> _i.e._, issuance of stock, election of directors, keeping
> of corporate records and the like, (2) inadequate
> capitalization, (3) whether funds are put in and taken
> out of the corporation for personal rather than corpo-
> rate purposes, (4) overlap in ownership, officers,
> directors, and personnel, (5) common office space,
> address and telephone numbers of corporate entities,
> (6) the amount of business discretion displayed by the
> allegedly dominated corporation, (7) whether the re-
> lated corporations deal with the dominated corporation
> at arms length, (8) whether the corporations are
> treated as independent profit centers, (9) the payment
> or guarantee of debts of the dominated corporation by
> other corporations in the group, and (10) whether the
> corporation in question had property that was used by
> other of the corporations as if it were its own.

_JSC Foreign Econ. Ass'n Technostroyexport v. Intn'l Dev. & Trade_

_Servs., Inc._, _supra_, 306 F. Supp.2d at 486, _quoting_ _Wm._

_Passalacqua Builders, Inc. v. Resnick Developers S., Inc._, _supra_,

933 F.2d at 139; _see_ _also_ _MAG Portfolio Consultant, GMBH v._

_Merlin Biomed Group LLC_, _supra_, 268 F.3d at 63.

59.  Undercapitalization, without more, is an insuffi-

cient basis to pierce the corporate veil.  _See_, _e.g._, _Oriental_

_Commercial & Shipping Co., Ltd. v. Rosseel, N.V._, 702 F. Supp.

1005, 1020 (S.D.N.Y. 1988), _citing_ _Gartner v. Snyder_, _supra_, 607

F.2d at 588; _see_ _also_ _Al Sayegh Bros. Trading (LLC) v. Doral_

_Trading & Exp., Inc._, 219 F. Supp.2d 285, 294 (E.D.N.Y. 2002).

60.  In addition, when dealing with small, closely-held corporations, "'the trappings of sophisticated corporate life are rarely present,' and [courts] must avoid an over-rigid 'preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history.'" Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 18 (2d Cir. 1996), quoting William Wrigley Jr. Co. v. Waters, 890 F.2d 594, 600-01 (2d Cir. 1989).

61.  New York courts hold that a "determinative factor" in the analysis "is whether 'the corporation is a dummy for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends.'"  Port Chester Elec. Const. Co. v. Atlas, 40 N.Y.2d 652, 657, 357 N.E.2d 983, 986, 389 N.Y.S.2d 327, 331 (1976), quoting Walkovszky v. Carlton, supra, 18 N.Y.2d at 418, 223 N.E.2d at 8, 276 N.Y.S.2d at 588; see also Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., supra, 933 F.2d at 138.

62.  Additionally, the Second Circuit has noted that under New York law "control, whether of the subsidiaries by the parent or the corporation by its stockholders, is the key; the control must be used to commit a fraud or other wrong that causes plaintiff's loss." Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., supra, 933 F.2d at 138, citing Am. Protein

Corp. v. AB Volvo, supra, 844 F.2d at 60 (2d Cir. 1988), Electronic Switching Indus., Inc. v. Faradyne Elec. Corp., 833 F.2d 418, 424 (2d Cir. 1987), and Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir. 1985).

63. For veil-piercing purposes, New York courts recognize the doctrine of equitable ownership, under which an individual who exercises sufficient control over a corporation may be deemed an "equitable owner," even if the individual is not actually a shareholder of the corporation. See In re Vebeliunas, supra, 332 F.3d at 92 ("Courts have recognized that the element of control may be predicated upon the concept of equitable ownership."), citing Freeman v. Complex Computing Co., Inc., supra, 119 F.3d at 1051-53, citing Guilder v. Corinth Constr. Corp., 235 A.D.2d 619, 619-20, 651 N.Y.S.2d 706, 707-08 (3d Dep't 1997), and Lally v. Catskill Airways, Inc., 198 A.D.2d 643, 603 N.Y.S.2d 619, 621 (3d Dep't 1993); see also Dow Chemical Pacific Ltd. v. Rascator Mar. S.A., 782 F.2d 329, 342-43 (2d Cir. 1986) (finding a defendant, who claimed to be a mere creditor, personally liable under an equitable ownership theory as he exercised control and treated the company as his alter ego for fraudulent purposes). Cf. Mediators, Inc. v. Manney, 93 Civ. 2304 (CSH), 1996 WL 554576 at *5 (S.D.N.Y. Sept. 30, 1996)(recognizing that a nonshareholder may be held liable under an alter ego theory if he or she was an equitable owner but declining to hold defendant

personally liable because defendant was not the "true puppeteer manipulating the strings of the [corporation]").

    64.    An essential and distinct element in piercing analysis is proving that a "fraud or wrong" was committed. <u>Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.</u>, <u>supra</u>, 122 F.3d at 134 n.2 ("[T]he New York Court of Appeals held that a conjunctive test was applicable and required a showing of both domination and fraud or wrong to justify the piercing of a corporate veil."), <u>citing</u> <u>Morris v. N.Y.S. Dep't of Taxation & Fin.</u>, <u>supra</u>, 82 N.Y.2d at 141, 623 N.E.2d at 1161-1161, 603 N.Y.S.2d at 811; <u>EED Holdings v. Palmer Johnson Acquisition Corp</u>. 228 F.R.D. 508, 512 (S.D.N.Y. 2005) (same); <u>Smoothline Ltd. v. North Am. Foreign Trading Corp.</u>, 00 Civ. 2798 (DLC), M19-375, 2002 WL 31885795 at *9 (S.D.N.Y. Dec. 27, 2002) ("Proof of fraud is a necessary element; 'the element of domination and control never was considered to be sufficient of itself to justify the piercing of a corporate veil.'"), <u>quoting</u> <u>Freeman v. Complex Computing Co., Inc.</u>, <u>supra</u>, 119 F.3d at 1053.  <u>Accord</u> <u>Elgin Sweeper Co. v. Melson Inc.</u>, 884 F. Supp. 641, 652 (N.D.N.Y. 1995) ("[S]ome proof of fraud, whether actual or intended, must be offered before the court can pierce the corporate veil."), <u>citing</u> <u>Warner Bros., Inc. v. Gay Toys, Inc.</u>, 598 F. Supp. 424, 430 (S.D.N.Y. 1984).  The "fraud or wrong" element is not satisfied merely by showing that the controlling party breached its contract.  <u>Cary Oil Co., Inc.</u>

23

v. MG Ref. & Mktg., Inc., 230 F. Supp.2d 439, 488 (S.D.N.Y. 2002)

("[I]t is well settled that a subsidiary's breach of contract,

without more, is legally insufficient to satisfy the "fraud or

wrong" prong of New York's veil-piercing standard.").  However,

proof of the five elements of common law fraud is not required to

prove the "fraud or wrong" component.  See Rotella v. Derner, 283

A.D.2d 1026, 1027, 723 N.Y.S.2d 801, 802 (4th Dep't 2001) ("A

plaintiff is 'not required to plead or prove actual fraud in

order to pierce the corporate defendant's corporate veil, but

only that the individual defendant's control of the corporate

defendant was used to perpetrate a wrongful or unjust act toward

plaintiff.'"), quoting Lederer v. King, 214 A.D.2d 354, 354, 625

N.Y.S.2d 149, 150 (1st Dep't 1995); Julien J. Studley, Inc. v.

Lefrak, 48 N.Y.2d 954, 956, 401 N.E.2d 187, 188, 425 N.Y.S.2d 65,

66 (1979) ("Although proof of fraud is relevant in [piercing the

corporate veil] it is not essential.").  See generally JSC

Foreign Econ. Ass'n Technostroyexport v. Intn'l Dev. & Trade

Servs., Inc., supra, 306 F. Supp.2d at 486 ("The stripping of

corporate assets by shareholders to render the corporation

judgment proof constitutes a fraud or wrong justifying piercing

the corporate veil."); Smoothline Ltd. v. N. Am. Foreign Trading

Corp., supra, 2002 WL 31885795 at *11 (discussing that the

shifting of assets by a corporation's equitable owner in order to

make the corporation judgment proof was a fraud or wrong that
justified veil-piercing).

        2.    Findings of Fact Relevant
              to Plaintiff's Claim against
              <u>Orsini for Breach of Contract</u>

      65.   Plaintiff claims that Dream Tours was a "sham or
dummy corporation, created for the purpose of evading or circum-
venting the law and defrauding plaintiff" (Am. Complaint ¶ 14;
Plaintiff's Proposed Findings of Facts and Conclusions of Law ¶
56), that "Dream Tours was operated by Orsini as an alter-ego for
purely personal rather than corporate ends" (Am. Complaint ¶ 16),
and that Orsini affirmatively misrepresented that he was the
Chairman of Dream Tours, although he did not consider himself to
be its true chairman (Am. Complaint ¶ 13; Plaintiff's Proposed
Findings of Facts and Conclusions of Law ¶¶ 39-44).

      66.   Plaintiff also claims that Orsini demonstrated his
control over Dream Tours by: (1) negotiating and signing the
contract at issue; (2) issuing instructions to the bank to wire
payment of the $15,000 deposit; (3) signing for the receipt of
the tickets; (4) providing his office address as the designated
appointed office of Dream Tours; (5) providing Dream Tours with a
telephone, facsimile machine and office space, as well as expend-
ing and intermingling his own personal funds for the expenses and
operation of Dream Tours and (6) representing himself as Chairman

of Dream Tours in his dealings with DER Travel but failing to observe any corporate formalities (Am. Complaint ¶¶ 13-14, 17; Plaintiff's Proposed Findings of Facts and Conclusions of Law ¶ 70).

67. Orsini concedes Dream Tours' undercapitalization and lack of adherence to corporate formalities (Defendant's Proposed Findings of Fact and Conclusions of Law 11-12). Nevertheless, Orsini argues that the veil should be pieced only as to Ghim, the purported owner or Secretary-Treasurer of Dream Tours, who abused the corporate form for his own fraudulent purposes.

68. I find that Orsini's actions are sufficient to warrant piercing the corporate veil and holding Orsini personally liable for Dream Tour's breach of contract. Dream Tours appears to have been formed and "used as a 'front' or a 'mere conduit,'" In re Gibraltor Amusements, Ltd., 291 F.2d 22, 24 (2d Cir. 1961), the sole purpose of which was obtaining an appreciable quantity of rail tickets from DER Travel for almost no consideration and then absconding with the tickets. Orsini, as an equitable owner of Dream Tours, acting in concert with Ghim and Kim (Stipulated Facts ¶ 10), used his control over Dream Tours in furtherance of a fraudulent scheme to misappropriate tickets from DER Travel, and the misappropriation resulted in a monetary loss to the plaintiff.

69.  Orsini is a relatively sophisticated, well-educated businessman; based on his education and experience, he is familiar for should be familiar with basic corporate requirements (Tr. 41-43, 59-62, 104, 131-33; see also Orsini Dep. (PX 23-A) at 5-17, 26-28, 31-34).

70.  Even though Orsini testified that he was not a shareholder in Dream Tours, (Tr. 46), Orsini exercised considerable dominion and control over Dream Tours.  For example, Orsini authorized the sole wire transfer out of Dream Tours' bank account to pay the $15,000 deposit for the tickets (Stipulated Facts ¶¶ 14, 15; PX 16-17; DX A14-A15; Tr. 56-57, 88-91; see also Orsini Dep. (PX 23-A) at 122-29).  With respect to Dream Tours' business affairs, Orsini represented himself as Chairman while negotiating and executing Dream Tours' contracts with DER Travel and Fleet Bank (PX 6; DX A9; Tr. 47, 87-88, 104, 131-33; see also Orsini Dep. (PX 23-A) at 93).  See Freeman v. Complex Computing Co., Inc., supra, 119 F.3d at 1051, citing In re Charnock, 97 B.R. 619, 628 (Bankr. M.D. Fla. 1989) (discussing the factors for finding equitable ownership in the context of piercing the corporate veil; "the [defendant's] dominion control over the assets and affairs of these entities and the total lack of involvement . . . by the president and sole stockholder, and the [defendant's] repeated representations to the public that he owned the assets and was in the sole control of the entities").

71.  Orsini played an active and exclusive role in negotiating the contract with DER Travel; neither Ghim nor Kim had any direct contact with DER Travel with respect to the contract (Stipulated Facts ¶¶ 4, 5, 6, 7; PX 2-5; DX 5-8; Tr. 42-45, 74-79; see also Orsini Dep. (PX 23-A) at 71, 76-77, 82-93).

72.  During his business transactions with DER Travel, Orsini personally negotiated significant changes in critical contractual terms, such as a three to five-fold increase in the quantity of tickets delivered on consignment, coupled with a 40% reduction in the deposit paid (Stipulated Facts ¶ 8; PX 2-5; DX A5-A8; Tr. 83-87; see also Orsini Dep. (PX 23-A) at 82-84, 87-92).

73.  Additional evidence of Orsini's business discretion and domination can be found in his signing for the tickets consigned to Dream Tours (Stipulated Facts ¶ 16; PX 8; Tr. 91-93) and his authorizing the only funds transfer made from Dream Tours' corporate bank account (Stipulated Facts ¶ 14; PX 16; DX A14; Tr. 90-91; see also Orsini Dep. (PX 23-A) at 125-27).

74.  Dream Tours exclusively utilized the office space, addresses and telephone numbers of Orsini's Petrotech company. Orsini's Petrotech office was Dream Tours' only place of business.  Orsini's Petrotech office was listed on the contract as the only "appointed" office for storing the tickets.  In addition, all correspondence between DER Travel and Dream Tours was

sent from or to Orsini's Petrotech office (Stipulated Facts ¶ 4, 5, 12; PX 1, 6; Tr. 68-69, 77-79, 91, 97-100; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 17-20, 24-25, 82, 130-31).

75.  All telephone calls, facsimiles, rent and similar office related expenses incurred by Orsini on behalf of Dream Tours were covered by Orisini, out of his own pocket, through his Petrotech company; Dream Tours did not pay for any of Orsini's business expenses (Tr. 120-21; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 130-32).

76.  The record shows that Dream Tours was essentially a shell or dummy corporation; it did not adhere to any customary and required corporate formalities, such as: holding organiza- tional meetings, adopting bylaws, electing a board of directors, issuing shares of stock, filing corporate tax returns, or main- taining corporate meeting minutes or records (Tr. 46-47, 56, 121- 23; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 143-47; Park Dep. (PX 24) at 21-22, 25-27).

77.  Despite the absence of corporate formalities, Orsini expressly represented that he was the "Chairman" of Dream Tours in signing correspondence to DER Travel, setting up a corporate bank account, as well as executing the railway ticket contract at issue (PX 6; DX A9; Tr. 47, 87-88, 104, 131-33; <u>see</u> <u>also</u> Orsini Dep. (PX 23-A) at 93).

78.  Although Orsini testified that his title of
Chairman was merely honorary and that he considered himself to be
just a salesman (Tr. 79, 104, 131-33), in dealing with DER Travel
and Fleet Bank, Orsini held himself out as the de facto Chairman
of Dream Tours, never advising either of these entities of his
title's purported honorary status (PX 6; DX A9; Tr. 47, 87-88,
104, 131-33; see also Orsini Dep. (PX 23-A) at 93).  Orsini's
unqualified use of the title of Chairman was misleading and
deceptive and sustains the "fraud or wrong" element necessary to
impose personal liability.

79.  Dream Tours was not yet incorporated at the time
Orsini first contacted DER Travel to negotiate a contract (Stipu-
lated Facts ¶ 4, 9; PX 14; Tr. 42-47; see also Park Dep. (PX 24)
at 7-9, 71, 76-77).  Moreover, after the DER Travel contract was
executed, Dream Tours' only other corporate activity was the
opening of the corporate bank account used solely to pay the
deposit on the tickets to DER Travel (Tr. 95-97; DX B at 4; see
also Orsini Dep. (PX 23-A) at 68, 130).

80.  The only individuals involved with Dream Tours
were Orsini, as Chairman and salesman, Ghim, as Secretary-Trea-
surer and purported owner, and Kim, as Dream Tour's alleged
travel expert (Tr. 44-47, 50-51, 78, 81-82, 111, 129, 131-33; see
also Orsini Dep. (PX 23-A) at 80-81, 93-94, 106-10, 119, 143-
144).  Orsini testified that he received no direct compensation

from Dream Tours for his efforts in negotiating and executing a contract with DER Travel on behalf of Dream Tours, which further suggests that his conduct was personal rather than corporate in nature (Tr. 46, 95-96; DX B at 4; see also Orsini Dep. (PX 23-A) at 75).

81. It can be inferred from the record that Dream Tours was purposefully undercapitalized. After Orsini wired the deposit money to DER Travel, Dream Tours' sole corporate bank account was nearly depleted -- only $100 remained -- and there were not enough funds to even cover account fees (Stipulated Facts ¶¶ 13, 14, 15; PX 15-17; DX A12-15; Tr. 56-57, 88-94; see also Orsini Dep. (PX 23-A) at 30-31, 122-29). Similar conduct has been regarded by this Court as fraudulent and wrongful and sufficient to pierce the corporate veil. See JSC Foreign Econ. Ass'n Technostroyexport v. Intn'l Dev. & Trade Servs., Inc., 306 F. Supp.2d 482, 486 (S.D.N.Y. 2004) ("The stripping of corporate assets by shareholders to render the corporation judgment proof constitutes a fraud or wrong justifying piercing the corporate veil."), quoting Godwin Realty Assocs. v. CATV Enterp., Inc., 275 A.D.2d 269, 712 N.Y.S.2d 39, 41 (1st Dep't 2000); Smoothline Ltd. v. N. Am. Foreign Trading Corp., supra, 2002 WL 31885795 at *11 (discussing that the shifting of assets by a corporation's equitable owner in order to make the corporation judgment proof was a fraud or wrong that justified veil-piercing).

82.   I infer from the record that Orsini's business
dealings with DER Travel were in furtherance of Orsini's, Ghim's
and Kim's joint efforts to defraud DER Travel by misappropriating
the tickets for their own personal goals rather than for the
benefit of the corporation.  Dream Tours appears to have been
nothing more than a legal shell established to insulate Orsini,
Ghim and Kim from liability in their fraudulent scheme to misap-
propriate tickets from DER Travel.

83.   Accordingly, I conclude that Orsini's control and
equitable ownership in Dream Tours, coupled with the fraudulent
or wrongful conduct of purposefully undercapitalizing Dream Tours
so as to remain judgment proof, as well as Orsini's misleading
and deceptive representations as to his title of Chairman,
warrant piercing the corporate veil, holding Orsini personally
liable for Dream Tours' breach of contract.

D.   Plaintiff's Fraud
     Claim Against Defendant Orsini

     1.   Legal Principles Applicable to
          Plaintiff's Fraud Claim against Orsini

84.   With respect to plaintiff's fraud claim, plaintiff
bears the burden of proving each of the following elements by
clear and convincing evidence:

     (1) [T]he defendant made a material false representa-
     tion, (2) the defendant intended to defraud the plain-
     tiff thereby, (3) the plaintiff reasonably relied upon

the representation, and (4) the plaintiff suffered
damage as a result of such reliance. . . .

Banque Arabe et Internationale D'Investissement v. Maryland Nat.
Bank, 57 F.3d 146, 153 (2d Cir. 1995), citing Keywell Corp. v.
Weinstein, 33 F.3d 159, 163 (2d Cir. 1994), Katara v. D.E. Jones
Commodities, Inc., 835 F.2d 966, 970-71 (2d Cir. 1987), and Hutt
v. Lumbermens Mut. Cas. Co., 95 A.D.2d 255, 466 N.Y.S.2d 28 (2d
Dep't 1983).  See also Dallas Aerospace, Inc. v. CIS Air Corp.,
352 F.3d 775, 785 (2d Cir. 2003) (fraud claim must be proven by
clear and convincing evidence); Ajax Hardware Mfg. Corp. v.
Indus. Plants Corp., 569 F.2d 181, 186 (2d Cir. 1977) (same).

85.  Under New York law, a corporate officer or em-
ployee is not insulated from liability for their own acts of
fraud by virtue of their status as a corporate officer or em-
ployee; there is no need to pierce the corporate veil in order to
hold corporate officers or employees individually liable for
their own acts of fraud.  See Morin v. Trupin, 747 F. Supp. 1051,
1068 (S.D.N.Y. 1990) ("The 'corporate veil' protects shareholders
from liability for corporate transgressions, but does not shield
corporate employees from their own wrongdoing."); see also Tomoka
Re Holdings, Inc. v. Loughlin, 03 Civ. 4904 (NRB), 2004 WL
1118178 at *7 (S.D.N.Y. May 19, 2004) ("A corporate officer is
individually liable for fraudulent acts or false representations
of his own, or in which he participates, even though his actions
in such respect may be in furtherance of the corporate business .

. . ."), _citing_ Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir. 1994), _quoting_ A-1 Check Cashing Service, Inc. v. Goodman, 148 A.D.2d 482, 482, 538 N.Y.S.2d 830, 831 (2d Dep't 1989); Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Inv. Ltd., 00 Civ. 9214(RWS), 2003 WL 1751780 at *8 (S.D.N.Y. April 1, 2003)(same).

86.    However, "a tort claim cannot be a reiteration of a breach of contract claim." Great Earth Intern. Franchising Corp. v. Milks Dev., 311 F. Supp.2d 419, 428 (S.D.N.Y. 2004), _citing_ Cohen v. Koenig, _supra_, 25 F.3d at 1173 (while "a plaintiff is not allowed to 'dress up' a breach of contract claim as a fraud claim, a valid fraud claim may be premised on misrepresentations made before the formation of the contract that induced the plaintiff to enter the contract").

87.    "The mere allegation that a defendant did not intend to perform a contract with a plaintiff when he made it generally fails to state a claim for fraud, however, and will be dismissed as duplicative under New York law." VTech Holdings Ltd. v. Lucent Techs., Inc., 172 F. Supp.2d 435, 439 (S.D.N.Y. 2001) (internal quotations omitted); _see also_ Lam v. Am. Exp. Co., 265 F. Supp.2d 225, 231 (S.D.N.Y. 2003) (noting that allegedly false statements of future intent cannot support a fraud action), _citing_ Intn'l Cabletel Inc. v. Le Groupe Videotron Ltee, 978 F. Supp. 483, 488 (S.D.N.Y. 1997) (same); Rocanova v. Equitable Life Assur. Soc., 83 N.Y.2d 603, 614, 634 N.E.2d 940, 944,

612 N.Y.S.2d 339, 343 (1994)("[A] contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations.");
McKernin v. Fanny Farmer Candy Shops, Inc., 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (2d Dep't 1991) ("It is well settled that where . . . a claim to recover damages for fraud is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie.").

89. When a fraud claim is grounded in allegations involving breach of contractual duties, a plaintiff must establish one of the following to sustain a claim sounding in fraud:

> (i) . . . a legal duty separate from the duty to perform under the contract . . . ; or (ii) . . . a fraudulent misrepresentation collateral or extraneous to the contract . . . ; or (iii) . . . special damages that are caused by the misrepresentation and unrecoverable as contract damages . . . .

Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted); see also TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 91-92 (2d Cir. 2005)(same); Manning v. Utilities Mut. Ins. Co., Inc., 254 F.3d 387, 400-01 (2d Cir. 2001)(same).

89. To constitute "a fraudulent misrepresentation collateral or extraneous to the contract," the statement must be "a misrepresentation regarding present facts, as opposed to one

reflecting an intent to perform in the future, [and must be] collateral to the contract." Solutia Inc. v. FMC Corp., 04 Civ. 2842(WHP), 2005 WL 711971 at *16 (S.D.N.Y. Mar. 29, 2005), citing Deerfield Comms. Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003, 1004 (1986); Great Earth Intern. Franchising Corp. v. Milks Dev., supra, 311 F. Supp.2d at 429 (S.D.N.Y. 2004) ("[T]he present fact exception draws its vigor not from the nature of the misrepresentation in a vacuum, but from the fact that such a misrepresentation wrong-fully induced the other party to enter into the contract.").

90. Plaintiff's post-trial submission relies heavily on two New York Court of Appeals decisions: Graubard Mollen Dannett & Horowitz v. Moskovitz, 86 N.Y.2d 112, 653 N.E.2d 1179, 629 N.Y.S.2d 1009 (1995) and Sabo v. Delman, 3 N.Y.2d 155, 143 N.E.2d 906, 164 N.Y.S.2d 714 (1957), both of which sustained fraud claims based on false statements of intention made during the parties' contractual dealings. However, plaintiff's reading of Graubard and Sabo has been consistently distinguished within this Circuit. See, e.g., Town of Haverstraw v. Columbia Elec. Corp., 237 F. Supp.2d 452, 455 (S.D.N.Y. 2002) (observing that Graubard's "seemingly inconsistent legal principles were recon-ciled by the Second Circuit" in Bridgestone/Firestone), citing Cougar Audio, Inc. v. Reich, 99 Civ. 4498 (LBS), 2000 WL 420546 at *6 n.4 (S.D.N.Y. April 18, 2000); Rays Trading (H.K.) Co. Ltd.

v. Judy-Philippine, Inc., 98 Civ. 0170 (JGK), 1998 WL 355422 at
*2 (S.D.N.Y. July 2, 1998) (discussing the "apparent tension
between the . . . aforementioned principles of New York law" and
citing the Second Circuit's rule in Bridgestone/Firestone as
reconciling this tension), quoting Int'l CableTel Inc. v. Le
Groupe Videotron Ltee, 978 F. Supp. 483, 487-89 (S.D.N.Y. 19970
(distinguishing Graubard and Sabo in light of
Bridgestone/Firestone and more recent New York Court of Appeal
decisions).  See also Rolls-Royce Motor Cars, Inc. v. Schudroff,
929 F. Supp. 117, 123 (S.D.N.Y. 1996); Papa's-June Music, Inc. v.
McLean, 921 F. Supp. 1154, 1161-62 (S.D.N.Y. 1996)(distinguishing
Graubard and Sabo on their facts based on a wealth of Appellate
Division and federal authority holding to the contrary).

     91.  Accordingly, with respect to a claim premised on
fraudulent inducement, "to ensure its independence from the
breach of contract claim, a properly pled fraudulent inducement
claim should be based upon a misrepresentation of present fact
that, though collateral to the contract, served as the inducement
for the contract."  Sultan v. Read, 03 Civ. 7462 (PKL), 2005 WL
486732 at *3 (S.D.N.Y. Mar. 1, 2005); see also Bear Stearns
Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp.2d
283, 310 (S.D.N.Y. 2005) ("In order for a fraud claim to coexist
with a breach of contract claim, the conduct giving rise to the
fraud claim must contravene a legal duty which is independent of

contractual relations between the parties.") (internal quotations omitted); Int'l CableTel Inc. v. Le Groupe Videotron Ltee, supra, 978 F. Supp. at 491 ("In sum, fraud in the inducement can be supported by a false statement of present fact, or by a false statement of future intent which concerns a matter collateral to a contract between the parties."); Lee v. Matarrese, 17 A.D.3d 539, 540, 793 N.Y.S.2d 457, 457-58 (2d Dep't 2005) ("[A] cause of action will be found to sound in tort rather than in contract only when the legal relations binding the parties are created by the utterance of a falsehood, with fraudulent intent and reliance thereon, and the cause of action is entirely independent of contractual relations between the parties.").

92. Thus, plaintiff must "demonstrate a fraudulent misrepresentation collateral or extraneous to the contract," upon which plaintiff detrimentally relied, to have a viable common law fraud claim again Orsini.

> 2. Findings of Fact
>    Relevant to Plaintiff's
>    Fraud Claim against Orsini

93. Plaintiff points to Orsini's putative false statements concerning his corporate status as Chairman of Dream Tours as the fraudulent misrepresentation collateral to the contract. However, plaintiff has offered no evidence of either the materiality of this representation or that it induced DER

Travel to enter into the contract.  Merely reiterating the
elements of a fraud claim and using the terms "material" and
"induce" in plaintiff's post-trial submissions is not clear and
convincing evidence sufficient to sustain a common law fraud
claim.  The record is devoid of credible evidence establishing
either materiality or inducement based on Orsini's claims of
being Chairman.

      94.  Further, plaintiff's contention that there was
"fraud in the inception" as evidenced by Orsini's signing the
contract and, subsequently, initialing certain provisions of the
contract after the contract was executed does not give rise to a
fraud claim.  Plaintiff's argument has two fatal flaws.  First,
the act of initialing and signing a contract merely expresses the
signatory's agreement that he or she is bound by the four-corners
of the contract.  In signing the contract, Orsini acknowledged
Dream Tours' future obligations to perform under the inherent
terms of the contract; he was not making representations as to
matters that were collateral or extraneous to the contract, nor
was he making representations as to matters of presently existing
fact.  As such, Orsini's actions give rise to a breach of con-
tract claim only and will not sustain a fraud claim.  See, e.g.,
Sultan v. Read, supra, 2005 WL 486732 at *3; Int'l CableTel Inc.
v. Le Groupe Videotron Ltee, supra, 978 F. Supp. at 491; C.B.
Western Fin. Corp. v. Computer Consoles, Inc., 122 A.D.2d 10,

12-13, 504 N.Y.S.2d 179, 182 (2d Dep't 1986) ("A cause of action for fraud in inducing a contract cannot be based solely upon a failure to perform contractual promises of future acts.  An alleged failure to perform such acts is a breach of contract which must be enforced by an action on the contract.").  Second, Orsini initialed specific contractual provisions <u>after</u> the parties entered into the contract; therefore, the act of initialing these provisions could not have been relied upon or served as an inducement to plaintiff's entering into the contract.

95.  Accordingly, I find that plaintiff has not sustained its burden of pleading and proving an actionable fraud claim against Orsini.

    E.   Plaintiff's Conversion
        <u>Claim Against Defendant Orsini</u>

        1.   Legal Principles Applicable to
            <u>Plaintiff's Conversion Claim against Orsini</u>

96.  As for plaintiff's claim for conversion, generally, a plaintiff must prove by a preponderance of the evidence: "[L]egal ownership or an immediate superior right of possession to a specific identifiable thing and . . . that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." <u>Independence Discount Corp. v. Bressner</u>, 47 A.D.2d 756, 757, 365 N.Y.S.2d 44, 46 (2d Dep't 1975); <u>see</u> <u>also</u>

Meese v. Miller, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 500 (4th Dep't 1981); AMF Inc. v. Algo Distribs., Ltd., 48 A.D.2d 352, 356, 369 N.Y.S.2d 460, 464 (2d Dep't 1975). Accord City of Amsterdam v. Daniel Goldreyer, Ltd., 882 F. Supp. 1273, 1280 (E.D.N.Y. 1995); United States v. Paladin, 539 F. Supp. 100, 103 (W.D.N.Y. 1982); Marcraft Recreation Corp. v. Frances Devlin Co., Inc., 459 F. Supp. 195, 197 (S.D.N.Y. 1978); Restatement (Second) of Torts § 228; 2 New York Pattern Jury Instruction - Civil Inst. 3.11 ("A person who receives possession of the property of another and thereafter, without authority, intentionally exercises control over it in such a manner as to interfere with the other's right of possession has converted that property and is liable for its value."). See also Estate of Wooters ex rel. Klein v. Goujjane, 305 F. Supp.2d 280, 286 (S.D.N.Y. 2003) (the elements of a conversion claim must be proven by a preponderance of the evidence), citing Leucadia, Inc. v. Reliance Ins. Co., 864 F.2d 964, 971-72 (2d Cir. 1988).

97. However, "New York law is clear in barring claims for conversion where damages are merely sought for breach of contract." Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc., 148 F. Supp.2d 321, 328 (S.D.N.Y. 2001); see also ESI, Inc. v. Coastal Power Production Co., 995 F. Supp. 419, 432 (S.D.N.Y. 1998) ("[A] plaintiff may not recast a contract-based claim as a tort claim 'where plaintiff is essentially seeking enforcement of

the bargain.'"), quoting In re Chateaugay Corp., 10 F.3d 944, 958 (2d Cir. 1993); Rolls-Royce Motor Cars, Inc. v. Schudroff, supra, 929 F. Supp. at 124 ("Claims for conversion similarly will be deemed redundant when 'damages are merely being sought for breach of contract.'"), quoting Peters Griffin Woodward, Inc. v. WCSC, Inc., 452 N.Y.S.2d 599, 600, 88 A.D.2d 883, 884 (1st Dep't 1982); Fraser v. Doubleday & Co., 587 F. Supp. 1284, 1288 (S.D.N.Y. 1984) (same).

98. As Judge Sweet has observed: "For a conversion claim to succeed in the context of a dispute regarding a contract, the breach of contract must result in some 'wrong' that is separately actionable." Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc., supra, 148 F. Supp.2d at 328 (S.D.N.Y. 2001), citing New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 316, 662 N.E.2d 763, 767, 639 N.Y.S.2d 283, 287 (1995).

> To determine whether an action for conversion (or any other tort) exists in addition to an action for breach of contract, a court must first ask whether "the alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent." W. Page Keeton, et al., Prosser & Keeton on the Law of Torts § 92 (5th ed. 1984). In other words, the Court must determine whether defendants had a duty separate from any duties imposed by defendants' contractual obligations. If no such duty exists, then contract is the only theory upon which liability can rest.

Elma RT v. Landesmann Int'l Marketing Corp., 98 Civ. 3662 (LMM), 2000 WL 297197 at *3 (S.D.N.Y. Mar. 3, 2000); see also Valjean Mfg. Inc. v. Michael Wediger, Inc., 03 Civ. 6185 (HB),

2005 WL 356799 at *16 (S.D.N.Y. Feb. 14, 2005)("Where a breach of contract is alleged, a conversion claim must demonstrate that the potential damages 'are beyond those for the alleged breach of contract claims were available.'"), quoting Pilliard v. Sotheby's, Inc., 95 Civ. 7775 (JFK), 1997 WL 381795 at *8 (S.D.N.Y. July 10, 1997); Spanierman Gallery, PSP v. Love, 03 Civ. 3188 (VM), 2003 WL 22480055 at *3 (S.D.N.Y. Oct. 31, 2003) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated . . ."); Global View Ltd. Venture Capital v. Great Cent. Basin Exploration, LLC, 288 F. Supp.2d 473, 479 (S.D.N.Y. 2003) ("[T]he well-settled principle [is] that, 'to sustain a conversion claim, a plaintiff must allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights.'"), quoting Fraser v. Doubleday & Co., Inc., 587 F. Supp. 1284, 1288 (S.D.N.Y. 1984).

        2.    Findings of Fact
              Relevant to Plaintiff's
              Conversion Claim against Orsini

99.  In support of its conversion claim, plaintiff exclusively relies on Dream Tours' express contractual obligations to: maintain the tickets at the appointed sales office, notify DER Travel of any changes of the appointed office, keep

the tickets in a safe and return the unsold tickets upon demand (Am. Complaint ¶¶ 30-32, 34, 36; Plaintiff's Proposed Findings of Facts and Conclusions of Law ¶ 74).

100.    Absent a showing of an obligation or duty separate from Dream Tours' contractual obligations, a conversion action does not lie, and plaintiff is left with a breach of contract claim.  See Valjean Mfg. Inc. v. Michael Wediger, Inc., supra, 2005 WL 356799 at *17 (holding that plaintiff's conversion claim failed when plaintiff had "merely dressed its contract claims in conversion clothing").  In similar actions brought within this Circuit, where plaintiffs raised both breach of contract and conversion claims premised on somewhat analogous consignment contracts, the Courts have repeatedly held that the conversion claim failed and only the breach of contract claim remained.  See, e.g., Klepner v. O.J. Lewis Mercantile Co., 159 F. 94, 95 (2d Cir. 1908)("[T]he facts set forth do not sustain a charge of conversion, although they make out a cause of action for breach of contract."); Banda v. Haro, 01 Civ. 5552 (RMB)(RLE), 2001 WL 1702205 at *3-*4 (S.D.N.Y. Jan. 10, 2001)(Report & Recommendation) ("Here, the damages sought for the breach of contract claim are identical to those sought for the conversion claim, and the 'wrongs' alleged in each claim are not separately actionable."); Assil Gem Corp. v. Greyhound Leisure Services, Inc., 00 Civ. 0072(NRB), 2000 WL 375244 at *4 (S.D.N.Y.

April 11, 2000) (A "simple breach of contract should not to be considered a tort unless a legal duty independent of the contract itself exists and has been violated.").

101.  The record in this action does not support a finding of any obligations or duties on the part of defendant separate from those imposed under the terms of the contract at issue.

102.  Accordingly, I find that plaintiff has not sustained its burden of pleading or proving an actionable conversion claim against Orsini.

F.  Damages

103.  For the reasons set forth in my November 2, 2002 Report and Recommendation, damages for plaintiff's breach of contract claim are calculated based on the fair value of the tickets, $108,300, less or offset by the $15,000 security deposit DER Travel retained, which is $93,300.00.  In addition, plaintiff is entitled to prejudgment interest at the statutory rate of nine percent (9%) on its contract claim from December 23, 1997. Furthermore, plaintiff is not entitled to punitive or exemplary damages.  Under New York law, punitive damages are generally not available for a breach of contract absent some showing of an independent tort targeted toward the public.  See TVT Records v. Island Def Jam Music Group, supra, 412 F.3d at 93, quoting New

York Marine & Gen. Ins. Co. v. Tradeline LLC, 266 F.3d 112, 130 (2d Cir. 2001); Fulton v. Allstate Ins. Co., 14 A.D.3d 380, 381, 788 N.Y.S.2d 349, 350 (1st Dep't 2005).

IV.  Conclusion

Accordingly, for all the foregoing reasons, I find that plaintiff has sustained its burden of proving sufficient indicia to warrant piercing the corporate veil, holding Orsini personally liable for Dream Tour's breach of contract. I further find that plaintiff has failed to sustain its burden of proving its fraud and conversion claims against Orsini, and those claims are dismissed.

Consequently, I direct that the Clerk of the Court enter judgment against defendant Orsini in the amount of $93,300, with interest of nine percent from December 23, 1997.

Dated:  New York, New York
October 28, 2005

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

Copies mailed to:

Stanley K. Shapiro, Esq.
111 John Street
Suite 800
New York, New York 10038

46

Paul S. Edelman, Esq.
Kreindler & Kreindler
100 Park Avenue
New York, New York 10017-5590